EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PEDRO ELPIDIO MADRIGAL, acusado y apelante.

*Números:* CR-66-254, CR-66-255    *Resueltos:* 24 de enero de 1967

*E. Armstrong de Watlington* y *Edna Abruña Rodríguez*, aboga-
das del apelante; *J. F. Rodríguez Rivera, Procurador General
Interino,* abogado de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del
Tribunal.

El Fiscal acusó al apelante de un delito de Asesinato en
Primer Grado consistente en que el día 31 de julio de 1965 y
en San Juan, "ilegal, voluntaria y maliciosamente, con pre-
meditación, deliberación, con intención y propósito decidido
y firme de matar, demostrando tener un corazón pervertido
y maligno, acometió y agredió alevosa y criminalmente al
ser humano Rafael Valentín Piñeiro Quiñones, con un cu-
chillo infiriéndole una herida de carácter grave que le oca-
sionó la muerte ese mismo día". También fue acusado de una

infracción al Art. 4 de la Ley de Armas.

Un jurado le declaró culpable de Asesinato en Segundo Grado y fue sentenciado a la pena indeterminada de 12 a 25 años de presidio con trabajos forzados. El Tribunal le declaró culpable de infringir el Art. 4 de la Ley de Armas y le sentenció a cumplir dos años de cárcel.

Señala como primer error que la pena impuéstale por la infracción al Art. 4 de la Ley de Armas es excesiva.

Tiene razón y así lo reconoce el Procurador General. Dispone el Art. 40 de la Ley de Armas (25 L.P.R.A. sec. 450) que toda persona convicta por cualquier de los delitos menos grave que se definen en el Art. 4 (Sec. 414 del mismo título de L.P.R.A.) será castigado con pena de cárcel por un término no menor de seis (6) meses ni mayor de un (1) año. Y el Art. 4, luego de relacionar las armas prohibidas dispone "y toda persona que usare contra otra cualquiera de las armas nombradas anteriormente en esta sección será culpable de delito menos grave, y si ha sido convicta previamente de cualquier infracción a este Capítulo, o de cualquiera de los delitos especificados en la sección 427 de este título, será culpable de delito grave".

El apelante fue convicto por uno de los delitos menos grave definidos en el Art. 4 (portar un cuchillo) y no se alegó ni probó que el acusado hubiera sido previamente convicto de cualquier infracción al Capítulo 51 (Ley de Armas). Por lo tanto la pena máxima que apareja el delito cometido por el apelante es de un (1) año de cárcel. En su consecuencia se modificará la sentencia apelada reduciendo la pena a 1 año de cárcel y así modificada será confirmada.

En el segundo error se ataca la suficiencia de la prueba de cargo para sostener el veredicto del jurado declarando al acusado culpable de asesinato en segundo grado.

La prueba de cargo es circunstancial. Ningún testigo declaró haber visto al acusado inferir la herida mortal a la víctima. El Ministerio Público presentó en primer término

el testimonio de seis testigos y luego el de otro más como prueba de refutación. El apelante utilizó únicamente su propio testimonio para establecer su defensa. Procederemos a resumir la prueba.

*Carmen Leonor Guerrido* declaró, en síntesis, que como a las tres y media de la mañana del día de los hechos salió del Sea Club hacia La Riviera. Éstos son dos establecimientos públicos en el área del muelle en San Juan; que mientras estaba en la escalera de La Riviera esperando a un muchacho llegaron allí tres señores, uno de los cuales le preguntó si quería salir con un señor nombrado el Capitán, respondiendo ella en la negativa. Al apelante dio la misma respuesta cuando éste le hizo la misma pregunta; que el apelante tocó a la testigo en el pecho y en la cadera y ésta le dijo al grupo que si la seguían tocando les iba a dar con el taco de sus zapatos, a lo que el apelante respondió "que si le daba al amigo de él, él me iba a dar cuatro puñaladas"; que luego se retiró a un tubo que había, llamó a un muchacho que le dicen Guare y le pidió que le acompañara porque se iba pero Guare le dijo que no, los muchachos que estaban hablando con él "me trajeron y no supe más nada", que no vio cuchillo o puñal y nada sabe de la muerte de Valentín Piñeiro.

*Dr. Pedro Díaz Gándara* declaró, en síntesis, que practicó la autopsia en el cadáver de Valentín Piñeiro Quiñones el día 31 de julio de 1965 a las cuatro y treinta pasado meridiano. Después de describir las heridas que presentaba el cuerpo del occiso, entre ellas una incisa penetrante en la espalda, describe la causa de la muerte en la siguiente forma: "El arma blanca usada penetra en el cuerpo de atrás hacia adelante, de izquierda a derecha y de arriba hacia abajo, en ángulo aproximado de los 121 grados con el eje mayor del cuerpo, de su penetración el arma blanca perfora la piel, tejido; el arma perfora la piel, tejido celular subcutáneo muscular de la región inframuscular izquierda, penetra en la cavidad toráxica por su región posterior a través del activo espacio intercostal,

perfora la pleura, el pulmón izquierdo y lacera la vena cava inferior produciendo masiva hemorragia interna, produciendo hemorragia masiva interna. El examen toxicológico de la sangre en este caso revela una concentración de 0.13 de por ciento de alcohol por peso. Y la causa de la muerte es una herida incisa penetrante en tórax." (T.E. págs. 21, 22.)

*William Benítez Navarro* declaró, en síntesis, que para la fecha de los hechos en horas de la madrugada se encontraba en el Club Antilles y de allí pasó al Club La Riviera; que presenció una discusión entre Carmen Leonor Guerrido y el apelante quien estaba acompañado de otras dos personas; que oyó al apelante cuando le dijo a la Guerrido que "si tú le das con el taco a mi amigo yo te voy a dar cuatro puñaladas"; que vio cuando se originó una discusión entre uno de los amigos del apelante y otra persona; que el grupo acompañante del apelante se fue a la puerta del muelle número siete de donde comenzaron a lanzar piedras hacia el Club La Riviera; que el grupo que quedó al otro lado en la Riviera, quienes eran amigos empezó también a lanzar piedras; que el grupo apertrechado en el lugar del muelle no eran amigos suyos y se dedicaban a trabajar en barcos; que éstos fueron aumentando hasta llegar al número de diez; que más tarde vio cuando al acusado-apelante corría detrás de una persona conocida como Guare, quien resultó ser Alfredo Vergara Santos; que volvió a ver al apelante frente al Limbo cuando salió el hijo del que nosotros llamamos capataz gritando "a él no, que es mi papá" y entonces el apelante lo dejó pasar; que al acercarse el apelante al testigo éste le vio "una cosa brillosa en la mano, que no digo que era un cuchillo ni un arma". Luego el testigo se metió con otras personas al muelle y "empezaron a tirarle piedras a ellos para el barco"; que había recibido una pedrada y le habían rajado la cabeza y tenía sangre en la camisa y como alguien había gritado "la policía" por temor a que fueran a arrestarlo se escondió y no supo nada más de lo que pasó; que no conocía personalmente

a Valentín Piñeiro Quiñones pero lo había visto esta noche, y habló con él cerca de La Riviera; que luego lo fue a ver a la casa cuando le dijeron que había muerto; que no vio al acusado con un cuchillo ni vio que éste matara a Valentín Piñeiro.

*Ana Luisa Jerés* declaró, en síntesis, que para la fecha de los hechos trabajaba de cajera en el Limbo Club, un negocio frente al muelle número siete; que estando en el establecimiento entró "el asesinado" y le pidió una cerveza, fue a marcar los cincuenta centavos en la caja y le sirvió; que entonces llegaron dos americanos; que cuando llegaron los americanos llegó un señor que se llama Andrés García Guzmán de acento dominicano y le gritaba y daba fuertemente en la barra para que llamara la policía por teléfono; que ella le dijo que tuviera calma que allí no había pasado nada; que entonces García Guzmán levantó una silla para arriba, intervino una persona y García Guzmán "puso la silla y salió rápido para afuera". Que el que más tarde se enteró que estaba muerto se había quedado sentado allí y ella se fue a servir dos "Rum and Coke" a los americanos; que vio al acusado por primera vez cuando la llevaron donde el fiscal; que se enteró que el que había muerto no estaba allí.

*Alfredo Vergara Santos* declaró, en síntesis, que como a las tres y media de la madrugada del 31 de julio de 1965 se encontraba en el Bar La Riviera que queda frente al muelle número siete; que bajó hacia la acera y vio a un grupo de personas frente al Limbo tirando piedras hacia el muelle 7 y que los del muelle tiraban hacia el Limbo; que se agachó; le dieron con una piedra "y yo con la misma piedra pegué a tirar hacia el muelle"; que entonces se calmó el tiroteo de las piedras "y los que estaban tirando del muelle se metieron hacia dentro, hacia el muelle; entonces nosotros nos vinimos para atrás otra vez"; que los del muelle volvieron a tirar piedras, entonces se calmaron y el testigo entró al Limbo donde había una discusión entre tres personas, la cantinera,

Valentín Piñeiro y otro señor que no le sabe el nombre. En la repregunta dice que este otro señor era Andrés Martínez. Sigue declarando que el testigo salió afuera y le dijo a uno que andaba con Andrés Martínez que se lo llevara para afuera para que no pasara nada "y vino y se lo llevó"; que al llevárselo se metieron en el muelle 7 volvió el tiroteo de piedras; que entonces se calmó el tiroteo de las piedras, el testigo se metió la mano en el bolsillo y le dijo al acusado que se iba a tirar piedras "le iba a meter un tiro, para amedrentarlo" porque él era el que empezaba a tirar piedras; "que en esos momentos el testigo no tenía arma encima; que el acusado se metió para alante y salió con un cuchillo en la mano, como de ocho pulgadas más o menos, de hoja blanca; que el acusado se me embaló detrás a mí y al que estaba conmigo al lado mío . . .''; que el testigo corrió hacia el Limbo y pasó la puerta del Limbo; que se detuvo y miró hacia atrás para ver la distancia que estaba el acusado y vio a Valentín Piñeiro salir del Limbo. Sigue declarando el testigo en la siguiente forma:

"En qué dirección sale Valentín Piñeiro?
　　Sale como yendo hacia San Juan.
Y cuando él sale caminando en dirección hacia San Juan, qué ocurre si ocurrió algo, que usted viera?
　　Bueno, cuando él doble hacia la esquina se le embala el señor atrás con otro demás.
Cuando dice 'el señor' señala al acusado?
　　Sí, señor. El y otro alante, iba uno con un palo y otro que iba sin nada detrás de él.
Se le embalan dos a él, uno con un palo, que usted dijo que no le vio nada?
　　Y él alante.
Y Pedro Elpidio Madrigal, qué si algo tenía?
　　Un cuchillo.
El cuchillo que usted nos describió?
　　Sí, señor. Cuando yo llego a la esquina a ver lo que está ocurriendo salen otras gentes del muelle atrás, y yo viré para atrás y me olvidé del asunto, porque no me dio tiempo a . . .

Yendo en la dirección que usted nos ha dicho hacia San Juan, qué lugar o tienda si alguna hay, que usted recuerde?

Una tienda que venden goma y eso de carro, que le llaman Firestone.

Entonces, usted dice que en esa dirección hacia San Juan es que Valentín va corriendo y detrás va Pedro Elpidio Madrigal con un cuchillo, uno que usted no sabe con un palo y otro sin nada en la mano?

Sí, señor.

Y qué entonces, usted dice, cuando usted iba a averiguar le tiraron piedras y usted regresa y no sabe lo que pasa allá?

Sí, señor. No sé lo que pasa." (T.E. págs. 78 a 80.)

Sigue declarando este testigo que después de eso "cojo el carro de William porque él no está por todo eso porque él tiene que ver una muchacha y dí vuelta en el carro y me quedé y él me dio pon hasta donde dormía y no supe nada hasta el otro día que fue la detective y preguntaron y eso. Nosotros le dijimos lo que había pasado y nos llevaron al cuartel y eso." Declaró además que no vio que el acusado matara a Valentín Piñeiro; que estuvo allí hasta las cinco y media de la mañana; que cuando llegó la policía él estaba allí pero no se había enterado de que había una persona muerta; que el muerto apareció frente a la Firestone. Declaró además que él (el testigo) ha sido convicto de delito grave, por droga.

*José L. Batista* declara, en síntesis, que es Policía Estatal y que en la fecha de los hechos prestaba servicios en la patrulla de San Juan; que como a las cuatro menos cinco de la mañana recibió un mensaje y se dirigió a la tienda Firestone en la calle Muelle, esquina Fernández Juncos; que en esa esquina "como a veinte pies hacia la izquierda frente a la vitrina de la tienda Firestone en la acera estaba un individuo boca abajo tendido en la acera y mostraba una herida en el costado izquierdo de su cuerpo", que esa persona era Valentín Piñeiro Quiñones; que por aquella área quedan varios bares y clubes nocturnos, entre ellos, El Limbo y La

Riviera; que no encontró arma blanca en los alrededores; que no vio a nadie al llegar, le tomó el pulso al herido, sintió que tenía pulso y procedió a montarlo en la patrulla y llevarlo al hospital Municipal de Santurce.

Ya hemos dicho que la única prueba de defensa fue el testimonio del propio acusado Pedro Elpidio Madrigal. Declaró en síntesis, que reside en la República Dominicana y trabaja como marino mercante en el barco llamado Loyda; que en la noche de los hechos estuvo visitando a un tío suyo y de regreso al barco entró al Club La Riviera para comprar cigarrillos; que cuando salió del negocio vio una especie de "revolú" y oye a alguien decir "mira donde va un dominicano, tírale también"; que mientras caminaba hacia el barco comenzaron a lanzarle piedras y que cuando quiso coger unas piedras para tirarlas el grupo que había detrás era demasiado grande. Luego entró al barco hasta donde fueron persiguiéndolo y una vez adentro no volvió a salir para afuera. Negó el testigo lo declarado por Carmen Guerrido, así como una serie de circunstancias traídas por la prueba del fiscal. Aceptó que era el cocinero del barco y que bregaba con cuchillos. Declaró además que cuando la policía lo fue a buscar al barco se llevó su camisa de trabajar; que en el barco hay un solo cuchillo que tiene como 14 ó 16 pulgadas de largo incluyendo el cabo. Declara que cuando lo llevaron donde el Fiscal logró que la policía lo llevara al barco para hablar con el Capitán; que después que habló con el capitán, entra el policía blanco, dice "espérate un momentico y abre la puerta y hace así, 'venga capitán' y se van los dos hablando, consiga el cuchillo que usted tiene ahí adentro del barco". Sigue contestando el testigo:

"Hon. Juez:

A quién le dijo eso?

El policía al capitán. 'Déjeme ver el cuchillo que usted tiene dentro del barco y dice el capitán, 'aquí hay uno sólo del servicio' y dice, 'déjeme verlo esto era lo que yo quería, para conseguir la

prueba del bandido, el criminal' eso fue lo que dijo la policía, inmediatamente me llevaron a la policía.

Lcdo. Velázquez:

Quién se llevó el cuchillo?

La policía hasta allá, hasta la Princesa y allá cuando se quedó mirándolo, un cuchillo oscuro de hoja oscura.

Y el cuchillo y la camisa?

Se la llevaron la policía.

Y por qué el fiscal no la ha presentado aquí, dónde están?

Ellos la tienen escondida, el policía que me iba a lavar la camisa para mandarla allá, que era de mi trabajo.

Nada más, señor Juez, esa es toda la prueba." (T.E. págs. 202, 203.)

El detective Jesús M. Pagán, como prueba de refutación del fiscal declaró que al investigar al acusado en la noche del 31 de julio de 1965, éste no le informó que él hubiese estado en La Riviera, oyera una discusión y que alguien gritara que ahí va otro de los dominicanos, y que le lanzaran piedras y que él también tirara piedras, yéndose a dormir después de eso.

■ Considerada la prueba de cargo en conjunto, de ser creída por el juzgador, es suficiente para sostener la conclusión de que fue el apelante quien infirió la herida mortal al interfecto y en su consecuencia que el veredicto de culpabilidad está sostenido por dicha prueba. El error no fue cometido.

En el tercer señalamiento de error se queja el apelante (1) de habérsele permitido al fiscal, contra su oposición, interpretar la ley en su informe a los miembros del jurado, y (2) habérsele permitido al fiscal argumentar en su informe al jurado y hacer referencia a prueba no presentada ni admitida durante el juicio.

En su informe de rectificación el fiscal hizo referencia a la presunción de veracidad que acompaña a todo testigo y argumentó que esa presunción se aplicaba al acusado por la forma en que había declarado, y su comportamiento en la

silla de los testigos. También hizo referencia el fiscal en ese informe a la duda razonable y manifestó que esa no era una duda caprichosa sino que la duda razonable tenía que estar basada en la prueba.

■ Opinamos que las referencias a la ley que hizo el fiscal en su informe no son de tal naturaleza que hayan perjudicado los derechos sustanciales del apelante. El juez trasmitió al jurado instrucciones correctas en cuanto a ambos puntos y no difieren de las expresiones hechas por el fiscal. No constituye motivo de revocación las referencias a la ley que haga el fiscal en su informe a menos que éstas perjudiquen los derechos sustanciales del acusado. 67 A.L.R.2d 245; 5 Wharton's *Criminal Law & Procedure*, § 2089, pág. 253.

■ En lo que sí convenimos con el apelante es en que el fiscal en su informe de refutación al jurado llevó al conocimiento de éste elementos que no estaban sostenidos por la prueba resultando tal conducta perjudicial a los derechos del acusado. Veamos lo sucedido.

El apelante, ocupando la silla testifical declaró que al día siguiente por la tarde cuando la policía fue a arrestarlo se llevó consigo una camisa suya y un cuchillo que se usaba en la cocina del barco. A preguntas de su abogado declaró:

"Lcdo. Velázquez:

Quién se llevó el cuchillo?

La policía hasta allá, hasta la Princesa y allá cuando se quedó mirándolo, un cuchillo oscuro de hoja oscura.

Y el cuchillo y la camisa?

Se la llevaron la policía.

Y porque el fiscal no las ha presentado aquí, dónde están?

Ellos la tienen escondida, el policía que me iba a lavar la camisa para mandarla allá, que era de mi trabajo."

El fiscal dijo al Jurado:

"No es que intervino otro presunto u otra persona, aparece casi inmediatamente que llega la policía, Carmelo Batista; allí

está el hombre boca abajo con un golpe aquí y una puñalada en la espalda con arma blanca. Que la policía no se la trajera a ustedes, en primer lugar, yo no creo que el arma que éste utilizara fuera el cuchillo del barco porque uno no se va a quedar con el arma después que uno no la utiliza, uno no se va a quedar con el arma, y la va a ir a guardar, uno la bota. Y la camisa, ¿qué hace una persona en primer lugar? Prueba que ustedes tienen aquí fue como dijo el patólogo que la hemorragia fue interna, la hemorragia fue interna.

Lcdo. Velázquez:

"Nosotros queremos hacer en este momento objeción, no porque tengamos temor alguno, sino porque no es el procedimiento. Queremos que conste en el récord que el fiscal está declarando y que no tuvo oportunidad para traer la camisa o para traer prueba de la policía, ¿dónde está esa camisa? y no la trajo a pesar de que trajo prueba de refutación y, sin embargo, ahora le está él, prácticamente, sentándose en la silla de los testigos a dar una explicación. Yo quiero y respeto tanto al compañero que el testimonio de él tiene que hacer un daño terrible al acusado. Yo soy de las personas que lo aprecio y lo respeto, sé que el testimonio es terrible. Si se pone a declarar y él no declaró, ni declaró el policía no tiene derecho ahora en su informe a hacer referencia a este testimonio.

"Hon. Juez:

Adelante fiscal. Tómese la excepción del compañero.

Hon. Fiscal:

Estoy hablando a ustedes de la camisa, en primer lugar, aquí no hay prueba ninguna que cuando a este señor le dieron la puñalada soltara un chorro de sangre que bañara al acusado. Esa prueba no la hay aquí. Esa prueba que ustedes tienen del patólogo, que la hemorragia fue interna, una hemorragia interna, una hemorragia hemasiva e interna. No es una cuestión cuando se la cortan aquí y el chorro de sangre baña al que está al lado, baña a las paredes. La prueba que ustedes tienen aquí, que la herida es por la espalda y que la vena cava es la afectada, que tiene una profundidad como de ocho pulgadas, según el patólogo, no que la sangre sale inmediatamente. En segundo lugar, que alguien comete un delito y le cae una chispa de sangre lava la camisa. Cuando la policía lo va a buscar al otro día si le queda algún

vestigio de sangre sería insuficiente para determinar si es sangre humana, es de análisis químico, no es como dice el compañero. Con una manchita así usted puede decir que tipo de sangre, hace falta una muestra de sangre, precisamente para hacer los análisis esos. Y además él tuvo la oportunidad de seguir, pidió otro testigo, de pedir a ese . . . si él no se enteró por boca del acusado, pues, pedir que le trajeran esa camisa. El también tuvo eso y yo no se lo oculté y ahí está, se la pudo haber pedido a la policía, pero yo, si le traigo esa camisa, es natural que si no da resultado alguno, pues, que no se la traigo porque eso no prueba nada si no da resultado. El arma, en cuanto al arma olvídense ustedes, un individuo comete un asesinato con un cuchillo no se va a quedar con el en la mano, lo tira al agua allí mismo en el muelle 7, búsquenlo, el único cuchillo que hay aquí es el de la cocina, búsquenlo. Recuerden que a él no lo arrestaron inmediatamente que tuvo tiempo para deshacerse del arma. El arma, ¿dónde está? Yo se lo pregunté. No sé donde está, ésa es la verdad." (Informe de Refutación, págs. 8 a 10.)

La primera razón que dio el fiscal en su informe para no producir en evidencia la camisa fue que debido a la naturaleza de la herida la sangre no sale inmediatamente y que no hubo pruebas de que saliera un chorro de sangre que bañara al acusado.

La verdad es que en cuanto a esa explicación del fiscal no se presentó prueba alguna a pesar de que el Pueblo utilizó el testimonio del doctor que practicó la autopsia del occiso.

La segunda razón fue que cuando alguien comete un delito y le cae una chispa de sangre lava la camisa y cuando la policía lo va a buscar al otro día si le queda algún vestigio de sangre sería insuficiente para determinar que es sangre humana.

Como tercera razón apuntó el fiscal que el acusado tuvo la oportunidad de pedir que trajeran la camisa y luego agregó ". . . , pero yo, si le traigo esta camisa, es natural que si no da resultado alguno, pues, que no se la traigo porque eso no prueba nada si no da resultado".

Todas estas manifestaciones del fiscal sobre hechos que no están en la prueba son graves en verdad, especialmente en un caso como el presente. El fiscal tenía en su poder la camisa y llevó al jurado con sus manifestaciones, que la camisa pudo haber sido lavada por el acusado y lo que es más perjudicial aun, que la camisa como consecuencia de haber sido lavada; pudo tener una "chispa" de sangre y que esta "chispa" de sangre era insuficiente para determinar si era sangre humana. Si la camisa ocupada al acusado tenía sangre, era ese un eslabón que le conectaba fuertemente con la comisión del delito ya que ningún testigo declaró haber visto al acusado inferir la herida al occiso. Sólo hay en la prueba una serie de hechos y circunstancias e indicios que le señalan, por inferencia, como el autor del delito. La referencia que hizo el fiscal en su informe a la camisa del acusado y a las explicaciones que dio para no presentarla en evidencia, inyectaron unos indicios más y muy fuerte que no están en la prueba, que señalaban al acusado como culpable del delito imputádole.

En otra parte de su informe el fiscal dijo:

"Quiénes de los que estaba allí era el que tenía el cuchillo y quién corría al muerto? y ustedes llegan conmigo a la conclusión de, bueno . . . el único que venía corriendo con un cuchillo momentos antes de aparecer el cadáver a Valentín Piñeiro es a este acusado. Que es al único que le ven un arma blanca en la mano y la muerte es de arma blanca y aparece allí mismo momentos después desangrando ya casi sin pulso. Es obvio que una persona que tiene una herida de puñal o arma blanca, la que fuera, así en la espalda, no puede seguir caminando por mucho, no, se tiene que caer. Y después que se cae empieza la languidez de la vida porque el corazón sigue latiendo y lo único que bombea es la sangre que está desangrando. El corazón late y va sangrando con menos fuerza, porque hay menos vitalidad en el cuerpo se va perdiendo, tarda en morir la persona, pero muere." (Informe de Refutación, pág. 11.)

A pesar de que como ya hemos visto, en el juicio declaró el médico que practicó la autopsia en el cadáver del occiso,

no se le preguntó a éste ni el fiscal produjo otro perito, para demostrar que una persona que recibe una herida como la que presentaba el interfecto no puede "caminar por mucho" y se tiene que caer. Estas afirmaciones y las que siguieron en el informe del fiscal son propias de testimonio pericial pero no debe el fiscal convertirse en perito, para llevar al jurado prueba ajena al récord.

Es doctrina conocida en ésta y en casi todas las jurisdicciones americanas que ningún argumento es lícito si hace referencia a prueba que no fue admitida durante el juicio. En este caso el Juez no trató de proteger los derechos del acusado dando las instrucciones necesarias en el momento oportuno y el error indudablemente lesionó los derechos sustanciales del acusado. *Pueblo* v. *Orona Merced,* 89 D.P.R. 336 (1963); *Pueblo* v. *Fournier,* 80 D.P.R. 390, 408 (1948); *Pueblo* v. *Ruiz,* 79 D.P.R. 957 (1957); *Pueblo* v. *Marchand Paz,* 53 D.P.R. 671, 680 (1938); 88 C.J.S. § 181; 53 Am. Jur. § 483; 5 Wharton's *Criminal Law and Procedure,* § 2082.

*En su virtud se revocará la sentencia apelada y se ordenará la celebración de un nuevo juicio.*