EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CRUZ RODRÍGUEZ MATOS y JOSÉ ANTONIO RIVERA TAÑÓN, acusados y apelantes.

*Número:* CR-68-209      *Resuelto:* 23 de diciembre de 1969

*Raúl Torres González,* abogado del apelante Cruz Rodríguez Matos; *Santos P. Amadeo,* abogado de José Antonio Rivera Tañón; *J. F. Rodríguez Rivera, Procurador General Interino,* y *Lydia Nieves Franqui, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Los apelantes Cruz Rodríguez Matos, conocido por Pin, y José Antonio Rivera Tañón, conocido por Piquete, fueron convictos de asesinato en primer grado por haber causado la muerte al anciano Luis Francisco Morales, mientras perpetraban y llevaban a cabo un escalamiento en primer grado. Rivera fue convicto por unanimidad del jurado; Rodríguez renunció al jurado durante el curso del proceso y el magistrado que presidía le declaró culpable.

Para solicitar la revocación Rodríguez Matos señala la comisión de tres errores (i) que se admitió indebidamente una declaración del apelante prestada sin asistencia de abogado en una etapa crítica del proceso acusatorio; (ii) que el tribunal tomó en consideración una confesión extrajudicial del coacusado Rivera Tañón al determinar sobre su culpabilidad; y (iii) que la prueba es insuficiente para sostener la convicción. ([1])

(i) La prueba de cargo tendió a demostrar que los apelantes, después de cometer en o alrededor del 25 al 26 de

---

([1]) El apelante Rivera Tañón sometió su recurso de apelación por el alegato presentado por el coapelante, por entender que "cubre ampliamente todos los aspectos legales que puede levantar [Rivera Tañón] en este caso." En realidad el único apuntamiento que puede beneficiar a Rivera es el relativo a la suficiencia de la prueba, pues los otros dos errores se refieren exclusivamente a Rodríguez Matos.

agosto de 1962 el delito imputado, se trasladaron a Estados Unidos. En 7 de marzo de 1963, luego de un trámite de extradición y de haber sido formalmente acusados por la muerte de Morales, el apelante Rodríguez prestó una declaración ante el fiscal Cabrera, ya advertido de que se le imputaba el asesinato, en la cual se limitó a afirmar que había salido de Puerto Rico desde el 20 de agosto utilizando un boleto de avión expedido a nombre de otra persona.([2]) Se arguye que esta declaración no es admisible fundándose en que fue hecha mientras se encontraba bajo custodia policíaca y sin que le fueran hechas las advertencias de ley, especialmente la relativa a asistencia de abogado. Aun cuando de su faz se trata de manifestaciones exculpatorias, *cf. Pueblo* v. *Couret Martínez*, 89 D.P.R. 57 (1963), (a) aparece que se le hicieron las advertencias relativas a su derecho a no declarar y a que, en caso de hacerlo, sus manifestaciones podrían utilizarse en su contra; y, (b) habiéndose celebrado el juicio en octubre de 1963, conforme resolvimos en *Pueblo* v. *Guadalupe Rosa*, 94 D.P.R. 190 (1967), no eran necesarias las advertencias requeridas por *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965) y *Escobedo* v. *Illinois*, 378 U.S. 478 (1964). Véanse, *Johnson* v. *New Jersey*, 384 U.S. 719 (1966) y *Jenkins* v. *Delaware*, 395 U.S. 213 (1969), en el cual se sostuvo que las garantías acordadas

---

([2]) Estos hechos reveladores de conducta incriminatoria (*consciousness of guilt*) constituyen prueba circunstancial admisible. Underhill, *Criminal Evidence* (5ª. ed., 1956), vol. 2, § 371, expone la regla así: "Como reveladora de conducta incriminatoria es pertinente evidencia de que el acusado incurrió en falsedades . . . sobre sus actos y paradero en o alrededor de la fecha del crimen . . . . Esta evidencia tiene mayor pertinencia, vigor y fuerza cuando las falsedades se expresan después que su autor tiene conocimiento que se sospecha de él o está acusado por el delito." Y añade, "Puede establecerse que al ser arrestado el acusado hizo manifestaciones falsas sobre su paradero al oficial que practicó el arresto." Véanse, Wigmore on *Evidence* (3ª. ed., 1940), vol. II, § 273; *Rizzo* v. *United States*, 304 F.2d 810, 830 (8th Cir. 1962); *People* v. *Proctor*, 337 P.2d 93, 100 (Cal. 1959); *State* v. *Spica*, 389 S.W.2d 35, 53 (Mo. 1965); *State* v. *Aldrich*, 175 A.2d 803, 806 (Vt. 1961).

en *Miranda* v. *Arizona*, 384 U.S. 436 (1966), no se extendían a encausados cuyo nuevo juicio comenzó después que se anunció la opinión, en 13 de junio de 1966, cuando el proceso original tuvo lugar antes de dicha fecha. De ser necesario, tampoco se impugna el carácter voluntario de la declaración, y hay ausencia total de intimaciones de coacción física o psicológica. Y el simple hecho, por sí solo, de que se encontraba bajo custodia, no hacía inadmisible la declaración, *Pueblo* v. *Martínez Figueroa*, 86 D.P.R. 413 (1962); *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954).

(ii) En el acto de pronunciar el fallo, el juez de instancia expresó:

"De esta evidencia el Tribunal deduce, el Tribunal aprecia al acusado actuando en una serie de hechos a la sazón y a la raíz de la muerte de esta persona que se menciona en la acusación, señor Morales. Conjuntamente con estos hechos que indican actuaciones del acusado, que no voy a comentar más adelante por resultar innecesario para dictar un fallo, el Tribunal ha visto independientemente, ha apreciado también evidencia relativa a la participación de él en el caso de José Antonio Rivera Tañón.

El Tribunal, en relación con las actuaciones del acusado a raíz, a la sazón de estos hechos, que se refiere la acusación, en compañía de una persona, el Tribunal deduce y concluye de acuerdo, no por el veredicto del jurado sino de su propia y particular iniciativa, culpable en el caso. Entiende todo esto como evidencia circunstancial que lo lleva a la conclusión de que el acusado es culpable del delito de asesinato en primer grado cometido mientras perpetraba un escalamiento. No he tomado en consideración la confesión del señor Rivera Tañón. Solamente la entiendo y la considero, como abogado, la considero aplicable al caso de Rivera Tañón.

*Siendo culpable Rivera Tañón, los hechos de los acusados, los actos llevados por el acusado en conjunto con Rivera Tañón* llevan a concluir al Tribunal en el sentido expresado de que el acusado es culpable del delito de asesinato en primer grado." (Énfasis suplido.)

■ Conforme resolvimos en *Pueblo* v. *Casanova*, 77 D.P.R. 729, 735–736 (1954), extendido en *Pueblo* v. *Barreto*, 87 D.P.R. 526 (1963), para cubrir un proceso ventilado por tribunal de derecho, la declaración extrajudicial de un coacusado incriminando a otro no es prueba legalmente competente ni admisible para determinar la culpabilidad de otro coacusado.([3]) Es ésta la norma de prueba judicial que tenía en mente el juzgador al hacer las manifestaciones transcritas.

Las expresiones del juez al pronunciar el fallo son confusas e imprecisas. Por un lado afirma categóricamente que "no he tomado en consideración la confesión del señor Rivera Tañón", y a renglón seguido indica que "*Siendo culpable Rivera Tañón*, los hechos de los *acusados*, los actos llevados por el acusado *en conjunto con Rivera Tañón* llevan a concluir al Tribunal en el sentido expresado de que el acusado es culpable del delito de asesinato en primer grado." Como surge posteriormente de la discusión del error relativo a la suficiencia de la prueba, la prueba básica, aunque no la única, que vincula a Rivera Tañón con la comisión del delito imputado, es su declaración prestada a los detectives en Nueva York, en la cual atribuyó a Rodríguez haber causado directamente la muerte de la víctima.

■ No empece las manifestaciones del juez,([4]) no estamos plenamente convencidos de que el juez de instancia hi-

---

([3]) A pesar de que el juicio se celebró estando vigentes las Reglas de Procedimiento Criminal y teniendo conocimiento de la declaración del acusado Rivera Tañón, no se solicitó por Rodríguez, conforme a la Regla 91, juicio por separado. Véanse, *Pueblo* v. *Cruz Jiménez*, 87 D.P.R. 133 (1963) y *Pueblo* v. *Flores Valentín*, 88 D.P.R. 913 (1963).

([4]) En la versión original de la transcripción certificada por el taquígrafo se había incluido al comienzo del último párrafo de las manifestaciones del juez que se transcriben en el texto la frase "De la confesión [se refiere a la del coacusado Rivera Tañón] hago una conclusión de su culpabilidad a su vez", inmediatamente antes de las expresiones "[s]iendo culpable Rivera Tañón, los hechos de los acusados, los actos llevados por el acusado en conjunto con Rivera Tañón llevan a concluir

ciera, al dictar su fallo, completa abstracción de la llamada confesión del coacusado Rivera Tañón y su contenido incriminatorio de Rodríguez. De ahí las referencias a "los actos llevados por el acusado en conjunto con Rivera Tañón", y "he apreciado también evidencia relativa a la participación de él en el caso de José Antonio Rivera Tañón." Tratándose de un caso en que la evidencia es prácticamente de naturaleza circunstancial e indirecta, cobra mayor importancia el apuntamiento. La lectura en conjunto de las manifestaciones del juez nos dejan insatisfechos de que efectivamente no se consideraran las expresiones altamente perjudiciales para Rodríguez que hizo Rivera Tañón. Siendo ello así, procede dejar sin efecto la sentencia condenatoria en cuanto al apelante Cruz Rodríguez Matos, y devolver el caso para que se le celebre un nuevo juicio.

(iii) Para la consideración del tercer error en cuanto a la suficiencia de la prueba para sostener la convicción de Rivera Tañón es preciso hacer un resumen de la prueba de cargo ofrecida, única que desfiló durante el proceso.

■ William Figueroa, declaró: Que el día 26 de agosto de 1962, a eso de la medianoche, mientras se encontraba en el balcón de su casa, en el Barrio Guadiana, de Naranjito, vio bajar a los acusados-apelantes, a quienes conocía, por un puente que hay detrás de su casa, por un camino que conduce a dicho barrio, por el cual se iba hasta la casa del occiso, quien vivía aproximadamente como a 500 yardas de su casa. En el contrainterrogatorio dijo que los acusados no llevaban

---

al Tribunal en el sentido expresado de que el acusado es culpable del delito de asesinato en primer grado." Mediante resolución de 22 de agosto de 1968 el tribunal ordenó la eliminación de la frase copiada.

El apelante Rodríguez solicitó se dejara sin efecto esta resolución fundándose en que efectivamente el juez había pronunciado tal frase, pero no compareció a la vista de la moción, en cuyo acto el juez se limitó a disponer que tanto la página original como la enmendada se elevaran a este Tribunal.

nada en las manos y que fueron ellos las únicas personas a quienes vio pasar por el camino esa noche.

Juan Vidal Rodríguez, declaró: Que vivía en el barrio Achiote de Naranjito, donde se dedica a la agricultura. El día 26 de agosto de 1962 alrededor de las dos o las tres de la mañana, mientras regresaba del barrio Anones con su hija y su esposa, vio a los acusados lavándose las manos en la orilla de un río cerca de un puente que colinda con su finca y que queda como a un kilómetro de la casa del occiso; detuvo su vehículo más adelante y desde allí los observó hasta que terminaron de lavarse las manos. Luego siguió hacia su hogar.

Cruz Alicea declaró: Que vive en una barriada llamada Cerro Número Dos, a la salida de Naranjito. Conoce a Cruz Rodríguez desde niño, quien al regresar de Estados Unidos se quedaba en la casa de su padre en el Cerro Número Dos. El día 26 de agosto de 1962 a eso de las seis de la mañana al abrir la puerta de su casa vio a Cruz Rodríguez Matos "un poquito como despeinado y sucio", con los zapatos sucios, en el balcón de la casa de Belén Moure. Al ella preguntarle si había dormido allí, él le contestó que llevaba un telegrama al barrio Mavillas de Corozal y "le había cogido el día". Dijo, en contrainterrogatorio, que no lo vio en "actitud o en alguna forma como la persona que ha cometido algo."

Basilisa Matos Rodríguez declaró: Que era tía del acusado Cruz Rodríguez, conocido por "Pin". El día 26 de agosto de 1962 alrededor de las diez de la mañana, su sobrino la visitó acompañado de otro joven, a quien identificó como el coacusado Rivera Tañón. Les ofreció café, pero ellos le dijeron que iban a dar una vuelta, se fueron, y no regresaron. Afirmó que los vio en actitud normal.

Juan Aníbal Reyes declaró: Que el acusado Rivera Tañón, quien era primo de su esposa, fue a su hogar el día 26 de agosto de 1962, alrededor de las diez y media de la

mañana, acompañado del coacusado, informándole que iba a despedirse porque iba para los Estados Unidos a trabajar. Allí almorzaron y luego descansaron, como hasta las siete de la noche. A esa hora salió con ellos, su esposa y su nena hacia el aeropuerto, a petición de Rivera, a separar el pasaje. Este llevaba unos zapatos en una bolsa; no llevaban maletas ni bultos. El les dejó en el aeropuerto haciendo los trámites de las reservaciones. Se veían normales.

Pascual López Osorio dijo que conocía a José Antonio Rivera Tañón por "Piquete" a quien vio la noche del 26 de agosto de 1962 en el aeropuerto. El acusado le dijo que iba a ver a su mamá en Nueva York, porque había recibido un telegrama informándole que estaba gravemente enferma.

Aurelio Archilla declaró: Que el día 26 de agosto de 1962, alrededor de las seis de la mañana encontró, cerca de su hogar, en el Cerro Núm. Uno de Naranjito, un llavero con varias llaves y una navajita, las cuales guardó para localizar su dueño. Dijo que conocía a ambos acusados, quienes residían en el Cerro Núm. Dos, que para ir al Cerro Número Dos había que pasar por el Cerro Número Uno.

El sargento de la Policía Luis A. Ramos, declaró: Que conocía a ambos acusados, quienes vivían en el Cerro Núm. Dos de Naranjito. El camino más corto entre la casa del occiso, en el barrio Guadiana, y dicho lugar es el Cerro Núm. Uno. Dijo que conocía a la madre del acusado Rivera Tañón, quien vivía también en el Cerro Núm. Dos. Como resultado de las gestiones oficiales que hizo en relación a este caso obtuvo varios objetos en la residencia del occiso, entre otros: una "tranca"; un revólver cargado; una sábana, una funda y una camisa ensangrentadas y un mosquitero. El testigo identificó los objetos así como varias fotografías ilustrando los mismos. Dijo que cuando vio el cuerpo tendido sobre la cama, con las piernas colgando, aún estaba vivo. Notó varios golpes en distintas partes del cuerpo y que el pantalón tenía los bolsillos al revés. Supo que murió

en la madrugada del día siguiente porque asistió al velorio. Durante el contrainterrogatorio dijo que fue al lugar de los hechos a solicitud del doctor Raúl Barreras del Hospital Municipal de Naranjito, quien le llamó, luego de haber examinado a la víctima en su hogar. Al llegar allí estaban otros familiares del occiso, entre otros, sus hijos Ramiro y Luis y Dalila Padilla, su nuera. Afirmó que los familiares de la víctima le indicaron que no habían movido ningún objeto. Con la ayuda de ellos, desvistió al herido y le puso payamas, antes de que le llevaran al hospital en una ambulancia enviada por el Dr. Barreras. Dijo además, que el occiso era lisiado, apenas podía caminar y sólo bajaba al primer piso de la casa con la ayuda de sus hijos.

Dalila Padilla de Morales declaró: Que el occiso era su suegro. Ella vivía cerca de él y le llevaba casi diariamente sus comidas, aunque a veces él iba a su casa. El sábado 25 de agosto le llevó la cena alrededor de las cinco de la tarde y él le entregó un dólar que sacó de una cartera que contenía "bastante dinero" para que le comprase alcoholado y aspirinas. Dijo que la casa de su suegro tenía solamente una puerta de entrada, la cual se cerraba con una aldaba y una tranca, por dentro. Al día siguiente de haber recibido el dinero a manos de su suegro fue alrededor de las diez de la mañana a ver por qué no iba a desayunar. Llamó dos veces y él no respondió por lo que entró, ya que la puerta estaba entreabierta; que el "taquete" estaba forzado; la puerta de entrada había sido forzada. Vio a su suegro sobre la cama, sangrando por la boca, con una pierna fuera del mosquitero y con la mano derecha cerca del revólver. Al lado de la cama estaba la tranca de la puerta. Salió inmediatamente a buscar a su cuñado porque su esposo estaba en la iglesia. La testigo identificó los objetos que habían sido previamente identificados por el Sargento Ramos, específicamente las llaves, que no encontró ese día "porque fui a buscar en el bolsillo y estaban al revés y no

tenía nada"; que en la cocina había una caja fuerte que no apareció forzada.

Ricardo Luis Morales, hijo del occiso, declaró que éste guardaba dinero en una caja fuerte y tenía dinero en su persona. Después de los hechos contaron el dinero de la caja en presencia del fiscal y otros policías y ascendió a la suma de $1,170.00. El testigo aseguró que su padre llevaba aproximadamente $1,000.00 en su persona; lo sabía porque como a las 10:00 A.M. él le había cambiado un cheque por esa cantidad, que guardaba en el bolsillo.

Víctor Santos Ortega, declaró que vivía en Naranjito donde estudiaba el séptimo grado. El día 25 de agosto de 1962 alrededor de las 9:00 P.M. estuvo hablando con los acusados, a quienes conoce como "Pin" y "Piquete", en el "bar" de Juanito Colón, frente a la plaza de recreo de Naranjito. Al preguntarle el fiscal, "¿Qué le dijeron los acusados a usted en relación a ese señor [el occiso], esa noche?", respondió "Me hablaron pero no recuerdo."

Rafael Maldonado, detective de la Policía declaró, luego de una extensa discusión en ausencia del jurado sobre la admisibilidad de su testimonio, que durante el mes de marzo de 1963 hizo gestiones para traer mediante el proceso de extradición a los acusados desde el estado de Nueva York. Al llegar a Puerto Rico, el 7 de marzo de 1963 llevó a los acusados a la Oficina del fiscal, Ramón R. Cabrera ante quien el acusado Cruz Rodríguez Matos en su presencia prestó la declaración a que nos referimos al discutir el anterior error.

María Mercedes Vélez, declaró, en ausencia del jurado, que era prima hermana de Rivera Tañón. El día 3 de marzo de 1963, en horas de la tarde, su primo la llamó para que lo fuera a buscar y lo llevó a su casa en Nueva York a donde llegaron los detectives Arthur Williams y Arthur Douglas. El acusado estaba nervioso y estuvo alrededor de quince minutos contestando las preguntas del detective Williams. Éste

hacía las preguntas en inglés y ella las traducía al español y al contestar el acusado en este idioma ella lo traducía al inglés. Dijo que estudió en Puerto Rico hasta el sexto grado y que llevaba aproximadamente diez años en Nueva York. Aseguró que varios meses después firmó una declaración jurada ante un notario sobre la conversación con su primo y los detectives, a requerimiento de éstos, después de haber leído dicha declaración.

Al prestar testimonio ante el jurado la testigo reiteró lo declarado anteriormente. Afirmó, además que luego de la mencionada entrevista Rivera Tañón salió de su casa con los detectives; que Rivera Tañón, a preguntas de los detectives, declaró en español que había ido a casa de la víctima, y que Cruz Rodríguez había entrado mientras él permanecía afuera y le había dado con una tranca al occiso; que entró cuando sintió un grito; que al salir se lavaron las manos en un río cercano; que había estado previamente bebiendo en un bar de Naranjito; que su propósito al ir a Nueva York era trabajar para contratar un abogado "para salir del problema que tenía." Durante el contrainterrogatorio dijo que no se creía capacitada para servir como intérprete en los idiomas español e inglés. Dijo que un día antes de la entrevista con Rivera Tañón hubo una fiesta en su casa, a la cual asistieron los detectives Douglas y Williams.

La cadena de hechos establecida por la prueba de cargo coloca a Rivera Tañón en el escenario del crimen y lo relaciona con su comisión. Constituye evidencia circunstancial suficiente para sostener su convicción. *Pueblo* v. *Bonilla*, 78 D.P.R. 152 (1955); *Pueblo* v. *Pérez Escobar*, 91 D.P.R. 10 (1964).

*Se confirmará la sentencia condenatoria dictada en el caso de José Antonio Rivera Tañón y se devolverá para la celebración de un nuevo juicio a Cruz Rodríguez Matos.*

El Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Hernández Matos no intervinieron.