EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS ORTIZ RODRÍGUEZ, acusado y apelante.

*Número:* CR-72-27 *Resuelto:* 27 de noviembre de 1972

*José Torres Ortiz,* abogado del apelante; *Gilberto Gierbolini, Procurador General,* y *Candita R. Orlandi, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR MARTÍNEZ MUÑOZ emitió la opinión del Tribunal.

Contra el apelante se radicó acusación de asesinato en primer grado, que luego fue enmendada a una de asesinato en segundo grado, después de desfilar la prueba del caso. Hubo alegación de grado subsiguiente, admitida por el apelante y, por lo tanto, ésta no se hizo saber al jurado. El jurado trajo un veredicto de culpabilidad por el delito de

homicidio voluntario, por mayoría de nueve a tres. La evidencia de cargo fue la siguiente:

El patólogo forense Dr. Loynaz testificó que el día 5 de octubre de 1967 le practicó la autopsia al cadáver de Martín Avila Ocasio. Halló que el cadáver llevaba varios días de muerto, aunque no podía precisar el día de la muerte. Determinó que la causa de la muerte fue un severo golpe[1] en la región torácica que le fracturó varias costillas en la espalda, le fracturó la clavícula derecha y le ocasionó hemorragias. También halló rasponazos en las rodillas y espinillas, pero no pudo notar golpes en el abdomen, el cuello o la cabeza. No supo decir qué cosa causó el golpe; a preguntas de la defensa, dijo que pudo haber sido una caída desde cierta altura o desde un vehículo en movimiento o por un barranco, aunque en este último caso sería difícil si el declive no era muy grande. (T.E. págs. 16–33.)

Las partes estipularon que ciertos testigos declararían, tomándose en conjunto, que el occiso Martín Avila Ocasio y el acusado Luis Ortiz Rodríguez estuvieron juntos el día 1° de octubre de 1967 desde las 8:30 de la mañana hasta las 9:00 de la noche en distintos cafetines y restaurantes en los pueblos de Bayamón, Naranjito y Comerío. En dichos cafetines el acusado y el occiso departían cordialmente, ingiriendo licor y entremeses, pagando cada uno indistintamente lo consumido y marchándose en un camión perteneciente a la Truck Fleets, Inc., conducido por el acusado. (T.E. págs. 34–37.)

El testimonio de José Antonio Cruz Hernández (T.E. págs. 38–68) consistió básicamente en declarar que vivía para el 1° de octubre de 1967 en el barrio Bayamoncito de Aguas Buenas; que ese día se encontraba entre 10:00 y 11:30 de la noche en un cruce de carreteras de ese barrio cuando vio un camión detenerse a cierta distancia de él. Una persona

---

[1] Interrogado sobre la posibilidad de que fuesen varios los golpes, el testigo declaró que no estaba seguro, pero que opinaba más probable que se tratara de un solo golpe. (T.E. pág. 29.)

se bajó del lado izquierdo del camión y aparentemente se puso a buscar algo en la orilla de la carretera. Luego se montó en el camión, dio la vuelta y siguió camino en dirección al testigo, pasándole por el lado a alta velocidad. Después el testigo siguió camino hacia su casa y al pasar por el lugar en que se había detenido el camión, vio en la orilla de la carretera a un hombre sentado en el suelo, con pantalón negro y camisa azul de cuadritos, que gemía con los brazos cruzados sobre el estómago. Siguió su camino el testigo y al llegar a su casa le dijo a su mamá que cerrara bien la puerta pues había un borracho por ahí y podía entrar. A los tres días de ese incidente vio cuando sacaron el cadáver del occiso de un barranco que quedaba cerca del lugar en que había visto antes al hombre que se quejaba. El cadáver, dijo, vestía pantalón negro y camisa azul de cuadritos. En una ocasión dijo que no se había fijado bien en el camión que vio la noche del 1° de octubre (T.E. pág. 59), pero al mostrársele una foto del camión que conducía el acusado ese día lo identificó como el mismo camión que vio la noche del 1° de octubre de 1967. (T.E. pág. 64.)

Ismael Mendoza Santiago declaró (T.E. págs. 71–113) que para el 1° de octubre de 1967 era vecino del barrio Baya-moncito de Aguas Buenas y que esa noche, como a las 11:30, se encontraba en su casa viendo televisión. Oyó el ruido de un camión que subía por la carretera y, como le pareció raro a esa hora, se asomó a la puerta y vio que pasaba un camión cuya marca y año identificó y vio que era "de la Fleet" (T.E. pág. 72). Al poco rato sintió al camión bajar de nuevo y luego volver a subir pasando frente a su casa. A poco el testigo vio al camión bajar de nuevo en "riversa" y pasar por encima de un montón de piedras como de cuatro pies de altura, deteniéndose más abajo con la parte trasera derecha fuera del pavimento. Después de patinar un poco, el conductor logró sacar el camión hacia adelante. El conductor se apeó, caminó hacia atrás y dio la vuelta por detrás del camión.

Entonces notó el testigo que había dos personas paradas bastante cerca una de otra; luego el conductor volvió a montarse en el camión y dar marcha atrás. El testigo se fue entonces a dormir. En el tribunal el testigo identificó al acusado como el conductor del camión e identificó una foto del camión que conducía el acusado el día 1° de octubre como el mismo camión que había visto aquella noche. Además, declaró que vio cuando se sacaba el cadáver del occiso de un barranco o declive bien cercano al lugar en que vio al acusado apearse del camión la noche del 1° de octubre. Dicho cadáver, según el testigo, vestía una camisa de cuadros y un pantalón oscuro.

Efraín Cintrón Santos (T.E. págs. 115–117) expuso que también reside en las parcelas Bayamoncito de Aguas Buenas; que la noche del 1° de octubre de 1967 estaba en su casa como entre las 10:00 y las 11:30 y se iba a acostar cuando oyó el ruido de un camión; que se asomó al balcón y vio un camión dando vueltas; que era blanco y de "cajón cerrado" el camión. Al otro día cuando se dirigía a su trabajo, a bastante distancia de su casa encontró al referido camión en una alcantarilla de la carretera de Aguas Buenas. Le tomó el número de tablilla al camión, el cual coincide con el número que aparece en la foto del camión que guiaba el acusado-apelante.

Natividad Pizarro (T.E. págs. 118–132) dijo ser hojalatero especialista en cerraduras de automóviles. El 18 de octubre de 1967 inspeccionó la cerradura del camión que conducía el acusado el 1° de octubre y determinó que la cerradura estaba en buenas condiciones y que por la forma en que estaba construida resultaba extremadamente difícil que se abriera accidentalmente, tanto por la persona que se hallase adentro como por los movimientos del vehículo.

El fiscal presentó además en evidencia cuatro fotos del camión que conducía el acusado, una foto del lugar donde se

detuvo el camión cuando fue visto por Ismael Mendoza Santiago y otra foto del lugar donde fue hallado el cadáver.

Terminada la presentación del caso del ministerio público, la defensa pidió la absolución perentoria, la cual fue denegada por el tribunal. La defensa sometió el caso sin presentar prueba, pidiendo que se dieran instrucciones al jurado sobre homicidio voluntario y homicidio involuntario. El juez accedió a dar instrucciones sobre asesinato en segundo grado y sobre homicidio voluntario, pero se negó a darlas sobre homicidio involuntario por considerar que no había evidencia alguna sobre este último.

En apelación se señala la comisión de dos errores: (1) la prueba fue insuficiente para sostener una convicción y (2) el tribunal debió transmitir al jurado instrucciones sobre el delito de homicidio involuntario.

¿Fue suficiente la prueba para sostener la convicción por homicidio voluntario? La evidencia en este caso es puramente circunstancial; no hubo testigo alguno que declarara haber visto al acusado inferir el golpe mortal al occiso, si es que tal cosa ocurrió.

 Sabido es que en todo proceso criminal es indispensable para una condena que el Estado pruebe el *corpus delicti*, es decir, el hecho de que se produjo un daño por una mano criminal. 1 Wharton, *Criminal Evidence* (1955, supl. 1972), sec. 17. En cuanto al grado de prueba requerido para establecer el *corpus delicti*, el Procurador General cita algunos casos al efecto de que sólo se requiere presentar prueba *prima facie* del mismo, pero examinados más de cerca estos casos demuestran que esa doctrina—excepción a la regla general de que todos los elementos del delito deben probarse más allá de toda duda razonable—es aplicable sólo a los casos en que ha habido alguna confesión o admisión por parte del acusado. Véase 1 Underhill, *Criminal Evidence* (1956, supl. 1970), sec. 35 ("The corpus delicti must be proved beyond a reasonable doubt.") y sec. 36 ("It has been held

that slighter evidence is needed to establish the corpus delicti when a confession is present.") ; *cf. Pueblo v. Castro Cruz,* 90 D.P.R. 206 (1964) ; *Pueblo v. Miranda Matta,* 88 D.P.R. 822 (1963) ; *Pueblo v. Hernández,* 75 D.P.R. 907 (1954) ; *Pueblo v. Ortiz,* 69 D.P.R. 375 (1948) ; *Pueblo v. Rivera,* 67 D.P.R. 297 (1947) ; *Pueblo v. Declet,* 65 D.P.R. 23 (1945) ; *Pueblo v. Truyol,* 36 D.P.R. 375 (1927) ; *Pueblo v. Matos,* 26 D.P.R. 586 (1918).

En el pasado hemos reconocido que la evidencia circunstancial es esencialmente igual a la directa y que ambas se evalúan con el mismo criterio: para producir una condena la evidencia debe probar la culpabilidad más allá de toda duda razonable. Esa norma sustituye a la antes existente, la cual exigía que, para producir una condena, la prueba debía ser no sólo compatible con la culpabilidad del acusado, sino incompatible con cualquier otra hipótesis razonable de inocencia. *Pueblo v. Bonilla,* 78 D.P.R. 152 (1955), seguido, entre otros, por *Pueblo v. Pagán Medina,* 99 D.P.R. 753 (1971) y *Pueblo v. Pérez Escobar,* 91 D.P.R. 10 (1964). Incluso el *corpus delicti* puede establecerse mediante evidencia circunstancial. *Pueblo v. Castro Cruz,* supra; *Pueblo v. Rivera,* supra; *Pueblo v. Declet,* supra. [2]

El comentarista Wigmore[3] hace un extensísimo análisis de la evidencia circunstancial a base de una clasificación tripartita de las circunstancias que pueden considerarse para establecer la culpabilidad de un acusado:

---

[2] Para más detalles sobre la evidencia circunstancial y su aplicación a distintos delitos, véanse *Pueblo v. Picó Vidal,* 99 D.P.R. 708 (1971) ; *Pueblo v. Sánchez Delgado,* 99 D.P.R. 260 (1970) ; *Pueblo v. Rodríguez Matos,* 98 D.P.R. 152 (1969) ; *Pueblo v. Rivera Antuna,* 88 D.P.R. 630 (1963) ; *Pueblo v. Juarbe Albarrán,* 83 D.P.R. 747 (1961) ; y *Pueblo v. Bonilla Figueroa,* 83 D.P.R. 295 (1961). En el caso de hurto, escalamiento, etc., es bien conocida la doctrina de "posesión inexplicada de objetos recientemente hurtados", la cual reconoce un caso típico de evidencia circunstancial. *Pueblo v. Arroyo Cortés,* 100 D.P.R. 341 (1971), y casos allí citados.

[3] 1 Wigmore, *On Evidence* (3rd ed.), secs. 38 a 465.

(a) circunstancias *prospectivas*: hechos anteriores al crimen y que apuntan hacia su futura comisión (motivo, plan, preparativos, etc.);

(b) circunstancias *concomitantes*: hechos simultáneos al crimen que permiten que se lleve a cabo por el acusado (presencia en el lugar del crimen, acceso a la víctima, etc.);

(c) circunstancias *retrospectivas*: hechos posteriores al crimen que sugieren que el acusado lo cometió (fuga, ocultación de evidencia, etc.).

■ Por otra parte, hay circunstancias que tienden a probar la *inocencia* de un acusado, verbigracia, el afecto o amistad entre el acusado y la víctima (prospectiva), la coartada (concomitante) y una conducta normal con posterioridad al crimen (retrospectiva).

Nos preguntamos si algunos de los factores que reconoce la doctrina como relevantes para probar circunstancialmente la culpabilidad de un acusado se dieron en este caso.

Primeramente, tenemos el problema del *corpus delicti*. La evidencia aducida para probarlo fue el testimonio del patólogo Dr. Loynaz al efecto de que Martín Avila Ocasio murió como resultado de un severo golpe en la región torácica y los testimonios de José A. Cruz Hernández e Ismael Mendoza Santiago al efecto de que vieron cuando se sacó el cadáver de Avila Ocasio de un barranco en un barrio rural donde era desconocido el occiso. Esta evidencia no establece un caso diáfanamente claro de muerte por mano criminal, como lo sería una muerte a balazos (*Pueblo* v. *Salgado Velázquez*, 93 D.P.R. 380 (1966)), a cuchilladas (*Pueblo* v. *Madrigal*, 93 D.P.R. 862 (1967)), por descuartizamiento (*Pueblo* v. *Hernández Santiago*, 97 D.P.R. 522 (1969)), por ahorcamiento con una soga (*Pueblo* v. *Arocho Medina*, 93 D.P.R. 162 (1966)), o por otras causas tales como envenenamiento, explosivos, etc. Tampoco resulta claro que fuese una muerte natural o accidental como lo sería en caso de una enfermedad infecciosa fatal. De hecho, una de las dudas principales en

este caso es qué instrumento o mecanismo causó o se usó para causar el golpe fatal.

Si hubo delito, ¿qué evidencia hay para conectar al acusado con la comisión del mismo? La prueba establece sin lugar a dudas que el acusado y la víctima estuvieron juntos el día 1° de octubre de 1967 durante las horas del día y que probablemente estuvieron juntos también en horas de la noche bien cerca del lugar donde luego apareció el cadáver del occiso. Con ello queda establecida la presencia del acusado en el lugar del crimen y su acceso a la víctima, factor éste que no basta por sí solo para determinar la culpabilidad, pero que puede tomarse en consideración junto a otros detalles. Véanse *Pueblo* v. *Madrigal*, supra; *Pueblo* v. *Salgado Velázquez*, supra; *Pueblo* v. *Arocho Medina*, supra. Esta sería una de las circunstancias "concomitantes" de las que habla Wigmore. Véase también Wharton, obra y tomo citados, sec. 185.

El Procurador General destaca el hecho de que el acusado abandonó apresuradamente la escena del supuesto crimen dejando al occiso sentado en la orilla de la carretera y quejándose de algún malestar con los brazos cruzados sobre el abdomen. También se halló al otro día el camión que guiaba el acusado estacionado en la orilla de una carretera a cierta distancia del lugar de los hechos. Estas actuaciones del acusado podrían interpretarse como un intento de evitar ser descubierto, si él cometió el supuesto crimen. El huir o tratar de ocultar la evidencia de un crimen es una circunstancia que puede tomarse en cuenta al determinar la culpabilidad de un acusado. Véanse *Pueblo* v. *Hernández Santiago*, supra; *Pueblo* v. *Arocho Medina*, supra; Wharton, obra y tomo citados, secs. 206 y 207. Sería ésta, según Wigmore, una de las circunstancias "retrospectivas".

Pero hay varios detalles dudosos. No resulta claro, por ejemplo, que el occiso estuviese mortalmente herido al ser abandonado por el acusado la noche del 1° de octubre de 1967. Se sabe que aún estaba vivo y el testigo que lo vio interpretó

su condición como una de embriaguez. La teoría de embriaguez encuentra apoyo en el hecho de que había estado todo el día ingiriendo licor, durante más de doce horas corridas. Además, el occiso parecía quejarse de dolor en el abdomen, lo cual es compatible con la embriaguez, pero que sería extraño si, como señaló el patólogo forense, no tenía lesiones notables en el abdomen y en cambio sufría de múltiples y severas lesiones en el tórax y en la clavícula. En esa condición agonizante, según la teoría del Pueblo, la víctima habría de moverse por su cuenta hasta ir a parar al fondo de un barranco que queda cerca del lugar donde fue visto quejándose.

En cuanto al camión abandonado, tampoco parece ser claro que la intención del acusado fuese ocultarlo, porque el lugar donde fue hallado—la orilla de la carretera de Aguas Buenas—no parece ser adecuado para ocultar un camión ni lo suficientemente apartado del lugar de los hechos para que lo interpretemos como un intento de ocultar la presencia del acusado en aquel lugar.

Frente a las circunstancias ya relatadas, hay que notar que existe otra circunstancia *exculpatoria* que tiende a favorecer al acusado. El testimonio estipulado de varias personas señala que el día de los hechos el acusado y el occiso estuvieron confraternizando cordialmente; comían, bebían y se transportaban juntos y compartían los gastos de lo consumido. En ningún momento del día o de la noche se vio conflicto o discusión alguna entre ellos. No se adujo por el Pueblo ninguna motivación posible para el crimen. Cierto es que probar la motivación no es indispensable para una condena, pero es igualmente cierto que si el Estado prueba tal motivación ello constituye un factor que junto a otros puede considerarse para probar la culpabilidad. De hecho, constituye un factor importante cuando se produce una condena a base de evidencia circunstancial, el que exista un motivo comprobado para el crimen, tal como el lucro, la venganza o la

cólera producida por una riña. Wharton, obra y tomo citados, sec. 166.

■ Las circunstancias de este caso son muy sospechosas. Nos parece lógico que se haya pensado en el apelante como posible culpable y que se le haya encausado; pero los distintos puntos desconocidos que deja la prueba han producido en nosotros una duda razonable sobre su culpabilidad. Quizás a ello se pueda atribuir el que el jurado haya rendido un veredicto (9 a 3) de *homicidio voluntario*, el cual resulta extraño por no haberse presentado prueba de "súbita pendencia o arrebato de cólera". Art. 203 del Código Penal, 33 L.P.R.A. 635.

El primer error señalado se cometió. *Por ello se revocará la sentencia apelada absolviéndose libremente al apelante.*