TEXTO COMPLETO DE LA SENTENCIA
El 22 de junio de 2001, se presentó ante el Tribunal de Primera Instancia el recurso de epígrafe. Carlos E. Justiniano García recurre de una sentencia dictada por el Tribunal de Primera Instancia, Sub-Sección de Distrito, Sala de Mayagüez, que, luego de un juicio en sus méritos, lo encontró culpable del delito de agresión agravada y le impuso la pena de multa. Sus señalamientos de error, discutidos en su posterior alegato cuestionan, en síntesis, la cantidad y calidad de la prueba para configurar el delito imputado así como la credibilidad de la misma.
Luego de un extenso trámite apelativo en el cual concedimos múltiples prórrogas, finalmente se aprobó una exposición narrativa y se sometieron los correspondientes informes de las partes. Estamos en posición de *675 resolver.
I
Carlos E. Justiniano García fue denunciado por el delito de agresión agravada (infracción Artículo 95 (c) del Código Penal de Puerto Rico). El Pliego de Denuncia imputa que “allá en o para el día 27 de junio de 2000 alrededor del mediodía, en Mayagüez, Puerto Rico, empleó fuerza contra una menor consistente en que [la] llamó, [le] agarró la mano y [la] llevó para una esquina del pasillo, [le] dijo que bonita [se] veía hoy y se acercó para d.ar[le] un beso, [la menor] viró la cara y [el apelante] [le] dio [el alegado beso] cerca de la boca en contra de la voluntad [de la menor], ” Los hechos se imputan cometidos en la oficina del apelante, quien es dentista y la menor era su paciente desde hace dos (2) años; al momento de los hechos, la menor contaba con catorce (14) años de edad. (Exposición Narrativa Estipulada, en adelante E.N.E. págs. 1-2).
Determinada causa probable, se señaló el caso para juicio. En el mismo prestaron testimonio la menor J.N. C., su madre Betsy Casanovas, una empleada del apelante Jessica Ramírez y la agente de la policía Melizet Acarón Rodríguez, quien investigó el caso. Examinemos la prueba.
La menor J.N.C. al declarar tenía quince (15) años de edad y era estudiante. El doctor Justiniano la había atendido por alrededor de dos (2) años antes del momento de los hechos. En ese momento, la menor contaba con catorce (14) años de edad. (Véase Denuncia imputada en los Autos Originales pág. 1). El doctor fue quien le puso los “bracers”. El día de los hechos, la madre de la menor la llevó a la oficina del apelante y se marchó. Cuando la llamaron, le quitaron las gomas y la chequearon, no recuerda el empleado que la “chequeó”. Luego vino el apelante y la “chequeo” y le dijo que “el trabajo estaba bien”. La testigo siguió declarando y expresó que ese día “el apelante le dio un beso en la mejilla al despedirse”', “que luego ella salió” porque su mamá la iba a buscar. “Salió con el propósito de dirigirse al frente para que le dieran su próxima cita, no recuerda quién le dio la cita”. Le dieron la cita y cuando ella fue a salir, el apelante la llamó para que fuera donde él, cuando eso, ella se encontraba en el “counter” de la oficina. El apelante la llamó por su nómbrenle dijo: “J.N.C. ven aquí’ y ella fue donde él. (Véase E.N.E. págs. 2-3).
La testigo declaró que cuando fue donde el apelante, éste la cogió por la mano y la llevó hasta el pasillo para dentro, que está cerca del “counted’. Que éste le dijo que “que bonita se veía hoy”. Ella no le dijo nada, “que se quedó como que no podía hablar”. El aquí apelante, en ese momento, le dio un beso en la mejilla. (Véase E.N.E. pág. 3). Declaró que ese beso en la mejilla fue posterior al beso que el aquí apelante le dio cuando terminó de examinarla y le dijo “que el trabajo estaba bien”. (Véase E.N.E. pág. 2). Declaró que luego el apelante se le acercó para darle, otro beso, en la boca, pero que ella viró la cara y el apelante se quedó con su mano agarrada, mirándola. La menor se alejó hacía atrás y el apelante le dijo “déjame darte un beso y ella le dijo que se tenía que ir”. (Véase E.N.E. pág. 3). Esta declaró que se sintió mal, como que le faltaban el respeto. (Véase E.N.E. pág. 3).
La menor declaró que luego de esto llamó a su mamá para que la viniera a recoger. Cuando llegó la mamá ella no le dijo nada. Que acompañó a su mamá al Centro Comercial y allá fue a donde su hermana trabaja, quien le preguntó si le pasaba algo y ella le dijo. En la casa, su hermana le pregunta si le había dicho a su mamá lo ocurrido y ella le dijo que no. Que luego su mamá le preguntó y ahí es que ella le contó. Le dijo que “el doctor Justiniano la había besado. Su mamá en ese momento le preguntó si estaba abierta la oficina del doctor, ella le dijo que sí y que su mamá se marchó para la oficina de éste”. Esta relata que también contó lo sucedido a un amigo y a su papá. (Véase E.N.E. pág. 4). En el tumo de contrainterrogatorio declaró que luego de salir de la oficina del apelante, vio a su amigo, al cual no le dijo que el apelante la había besado, pero que la había tratado de besar. (Véase E.N.E. pág. 7). (Enfasis nuestro.)
Declaró que no sabía para qué el apelante la llamaba. El no le dio razón alguna. Que cuando el apelante la llamó, le preguntó por la taqeta de citas y ella le contestó que la misma “estaba en su casa”. “Que cuando ella se acercó a él, éste le toma la mano derecha; que lo cierto era que el apelante antes le había tocado la mano, *676 que él no la haló, pero que la tocó con la mano izquierda y le tomó la mano derecha”. Declaró, además, “que el primer beso que el apelante le dio fue en el área de la silla de trabajo”. “Que el apelante no le besó la boca.” Luego del segundo beso en la mejilla, el apelante se le acercó como para darle un beso en la boca, y en ese momento ella retiró su rostro del rostro del apelante. “Que cuando hizo dicho acto, los rostros no vinieron en contacto. En ese momento, la testigo dijo que ella sintió que hubo un contacto con su cuerpo”. Se le preguntó dónde, y dijo “que al lado de la boca, y que fue con la boca del apelante”. (Véase E.N.E. pág. 6). (Enfasis nuestro.)
El abogado confrontó a la testigo con su declaración jurada donde indicó que: “se me acercó para darme un beso en la boca y yo le vire la cara y su boca quedó cerca de la mía”. (Véase E.N.E. pág. 7). El abogado del apelante la interrogó como sigue: “le pregunto nuevamente si la boca del apelante vino en contacto con su cuerpo ”, a lo que contestó que “no”. La testigo reconoció que en la declaración jurada suscrita ella nunca indicó que el apelante la besó en ese momento; que estar cerca no era haber recibido un beso. (Véase E.N.E. pág. 7). La menor se reafirmo en ese hecho, que el apelante la había tratado de besar, y se le preguntó “si el apelante la había besado..., a lo que contestó, que no la había besado; que ella sabía lo que era besar”. Se le preguntó de nuevo que “si la realidad era que el apelante no la había besado, a lo que contesto no me beso”. (Véase E.N.E. pág. 8). (Enfasis nuestro.)
La testigo fue confrontada con el hecho de que en tres (3) ocasiones durante su testimonio había dicho que el apelante no la había besado y sin embargo, cuando se sometió el caso ante el Tribunal Municipal, había dicho que sí. La testigo dijo que “en ningún momento [...] él me había dado un beso”, y añade “intentó, eso es lo que sigo diciendo”. (Véase E.N.E. pág. 8). (Enfasis nuestro.)
Haciendo uso del pliego de denuncia radicado, se confrontó a la testigo sobre el hecho de sí el apelante le pidió que le diera un beso en la boca, a lo que ésta contestó “él no lo pidióque ella no le dijo a la mujer policía que el apelante le preguntara “¿te puedo dar un beso en la boca?” (Véase E.N.E. pág. 9). Se le preguntó si el apelante le había dicho “que bonita me veía hoy”, suceso que surge de la denuncia, a lo que ésta contestó, que eso no lo dijo. Que eso no fue lo que ella le informó a la mujer policía. Esta aclara que “no sabe lo que pasó que escribieron eso -se refiere al contenido de la denuncia-, pero que eso no fue lo que ella dijo”. Reitera que el apelante no le dijo que le diera un beso; que tampoco le dijo “déjame darte un beso”. “Se le preguntó que qué era lo correcto, si lo que estaba declarando en sala, en el sentido de que el apelante no le había dicho eso, “déjame darte un beso”, o lo que decía en la declaración jurada. A lo que contestó “que lo que había en la declaración jurada. Que no era correcto lo que había declarado en el Tribunal”. (Véase E.N. E. pág.9). (Enfasis nuestro.)
La segunda testigo de cargo fue la madre de la menor, Betsy Casanovas.
Esta testigo expresó que el día de los hechos le dijo a su hija “que tan pronto terminara le enviara un beeper para venirla a buscar; que recibió un mensaje como a las 12:10, más o menos, y otro enseguida: “mamá, ven a buscarme enseguida, no tardes’.” (Véase E.N.E. pág. 10). Declaró que cuando fue a buscar a la menor la vio un poco molesta, pero no le preguntó nada. (Véase E.N.E. pág. 10).
Estando en la casa, la testigo escuchó cuando su hija mayor le preguntó a la menor, “se lo dijiste a mami”. (Véase E.N.E. pág. 10). “Que ella se preocupó, le preguntó y que la menor le contesto: “mami yo te lo voy a decir. Es simplemente que el médico hoy se puso fresco conmigo”. Que ella le dijo “qué como iba a ser” y que la menor le dijo que “él le dio varios besos”, a lo que ella le contestó, “pues es que él es atento” y que la menor le dijo “que no era un beso igual, que él la quiso besar en la boca”. (Véase E.N.E. pág. 8).
En cuanto a lo relatado a ésta por la menor, ella miró el reloj y vio que eran cerca de las 6:00 p.m. y pensó que el apelante tenía que estar en su oficina y se dirigió a dicho lugar. (Véase E.N.E. pág. 10) Que cuando llegó *677 a la oficina del apelante éste la recibió y “le preguntó el motivo de la visita y ella le dijo que venía con relación al beso que le había dado a su hija; y él le contestó sí, pues yo le doy besos a todos mis pacientes; que ella le indicó que no era un beso común; que le dijo tú quisiste darjle] un beso a mi hija en la boca; que él le contestó que tenía que haber un malentendido; que el beso que él le había dado era sin malicia, que si J.N.C. se había molestado, él le pediría perdón... le indicó que si le molestaba demasiado lo del beso, él iba escribir para acordarse en el mismo expediente no beso o no besar; que frente a ella él escribió en el expediente no beso. (Véase E.N.E. págs. 10-11). Se confrontó a la testigo con la declaración jurada que ésta suscribió, en cuanto a este último hecho. Admitió que no era correcto lo que había dicho “de que había visto lo que el apelante escribió”, “que lo cierto era lo que decía la declaración jurada y no lo que contestó en sala”. (Véase E.N.E. pág. 13).
Atestó que el domingo, 9 de julio de 2000, el doctor Justiniano llamó a su casa [...] y que él le dijo que “deseaba hablar con ellos porque él quería que ellos fueran a la oficina [...], para hacer unos arreglos, porque él consideraba que lo que ha pasado no es para ir a corte.” (Véase E.N.E. págs. 11-12).
En el tumo de contrainterrogatorio declaró que cuando ella habló con el apelante no sabía con detalles dónde había sido el beso; que en un momento posterior se enteró que fueron en el cachete porque ella (la menor) se viró y que fue al lado de la boca; que fueron tres besos. (Véase E.N.E. pág. 12). Se le preguntó si J. N.C. le dijo cuál de esos tres besos era el malicioso. A lo que ésta contestó “ella no me dijo en ningún momento que eran besos maliciosos”. Reconoció que en su declaración jurada no dijo que eran tres besos, que el apelante tampoco le dijo que le hubiera dado tres besos a la menor. (Véase E.NJE. pág. 12).
Afirmó, durante el contrainterrogatorio, que el apelante no la invitó a ella a que trajera a su esposo y viniera con J.N.C. para discutir el asunto, pero que sí la invitó para reunirse para pedirle perdón a ella y su esposo por si había un malentendido. (Véase E.N.E. pág. 12).
La próxima testigo presentada por el Ministerio Público fue la empleada del apelante, Jessica Ramírez Carrero. Sobre los alegados hechos ocurridos el 27 de junio de 2000, ésta indico que “le dio una cita a la menor J.N.C. cuando iba a salir de la oficina..., que cuando le dio la cita, el apelante llamó a la menor... que ésta fue donde el apelante... que no escuchó la conversación entre ellos”. (Véase E.N.E. págs. 14-15). “Que ella vio todo completamente normal; que el apelante no iba hablando a J.N.C.; que tampoco la iba tocando”, (Véase E. N.E. pág. 15). “En ningún momento escuchó ni vio al apelante hacerle nada a J.N.C. ” (Véase E.N.E. pág. 16).
Por último, fue presentada como testigo la Agente Melizet Acarón Rodríguez. Esta declaró que el 3 de julio de 2000, entrevistó a la menor J.N.C. y ésta le contó lo siguiente:
“Que el día 27 de junio de 2000, ella tenía una cita con el ortodoncista para el chequeo; que después de haber tenido la evaluación salió del área de trabajo del apelante y se dirigió a recepción; que cuando la recepcionista Jessica Ramírez le iba dar una cita, el apelante volvió y la llamó; que ella se dirigió hacia donde el apelante y que éste le preguntó por su tarjeta de cita y ella le dijo que no la tenía; que el apelante la tomó por un brazo y la llevó a un área de su oficina, a un pasillo donde hay unos espejos; que una vez en el sitio, el apelante le dijo que qué bonita se veía el día de hoy y se dirigió hacia ella para darle un beso; que cuando ella ve que él le iba a dar un beso, ella le vira la cara y se lo da cerca de los labios; que el apelante le dijo que si le podía dar un beso en la boca; que ella le contestó que no; que el apelante volvió y le dijo “pero un beso en la boca” y ella volvió y le repitió que no; que él la había tomado por la mano y que le dijo vamos a mi oficina que allí nadie nos ve; que ella le dijo que no, se [zjafó de la mano y se dirigió hacia el área de recepción; que una vez en el área de la recepción le dieron una cita y ella bajó las escaleras para esperar a su mamá.” (Véase^E. N.E. págs. 17-18).
La testigo declaró que el 5 de julio de 2000, entrevistó al apelante en su oficina. Este le dijo “que lo alegado *678 era un malentendido”. (Véase E.N.E. pág. 18). La agente lo citó para el 7 de julio de 2000 y le dijo que “viniera con el expediente de J.N.C.” (Véase E.N.E. pág. 18). Ese día, nuevamente, el apelante le dijo que “eso había sido un malentendido”. Que en todas las ocasiones que ella entrevistó, al apelante, éste siempre le indicó que todo era un malentendido. (Véase E.N.E. pág. 22). Que cuando ella lo entrevistó él le mostró el expediente de la menor y ella pudo notar que en el mismo decía, “no besar a la paciente”-, que esa nota el apelante le dijo que él personalmente la había puesto; que ella entiende que la nota la puso después de los hechos; que no le dijo la razón porqué puso la nota. (Véase E.N.E. pág. 18). El día 11 de julio de 2000, ella volvió a la oficina del apelante para entrevistar otros empleados; que ella quería saber quiénes estaban ese día trabajando; que la única que estaba trabajando cuando los alegados hechos era Jessica Ramírez. Esta le reitero a la agente que ella había visto al apelante cuando llamó a la menor, pero que no oyó, ni vio que éste le hiciera o dijera nada. (Véase E.N. E. pág. 18).
En el tumo de contrainterrogatorio, ésta declaró que la menor le dijo que el apelante le pidió que le diera un beso; que ella hizo ese señalamiento en su declaración jurada porque J.N.C. se lo dijo. Se confrontó a la testigo con la declaración jurada y se le preguntó si era o no cierto que en dicha declaración ella no había aludido a que [la menor] ese día se le dieran tres besos en la oficina del apelante. Contestó a la pregunta que en su declaración jurada ella no aludía a que fueran tres besos; que sólo señalaba que se le había dado un beso; que J.N.C. le dijo que el apelante le pidió que le diera un beso; que ella hizo ese señalamiento en su declaración jurada porque [la menor] se lo dijo. Se le preguntó a la testigo que si J.N.C. hubiese dicho en su testimonio en sala que el apelante no le pidió un beso, en ese entonces, la declaración estaría incorrecta. Contestó que “a ella sí le dijo que le había pedido dicho beso”-, que ella en su declaración jurada también expresó que [la menor] le dijo al apelante “un beso en la boca” y que él le contestó “sí, en la boca” y si J.N.C. en sala hubiese negado dicha expresión, en ese entonces, su declaración estaría incorrecta. (Véase E.N.E. pág. 19).
Declaró que de la investigación que realizó, surgió que el apelante de forma común y corriente, en manifestación de cariño, cuando se despide de sus pacientes femeninos, “le da un beso en el cachete”. Que si [la menor] le hubiese dicho a ella, que cuando salió de la oficina o cuando llegó, el apelante la saludó con un beso en la mejilla, ella lo hubiera puesto en su declaración jurada; pero que no se lo dijo; que si se lo dijo, se le tiene que haber olvidado, pues no lo puso en su declaración jurada; que a ella ese dato se le pudo haber quedado; que ella desconoce si cuando J.N.C. llegó a la oficina le dieron un beso o si fue cuando terminaron de atenderla. (Véase E.N.E. págs. 19-20). (Enfasis nuestro.)
A la testigo se le preguntó, si surge de su investigación, cuántos besos el apelante le había dado a la menor ese día, a lo que contestó que “dos”. Esta fue confrontada con su declaración jurada, donde decía que solamente se le había dado un beso y la agente respondió que “el otro se le había olvidado anotarlo”. (Véase E.N.E. pág. 20). Que dicho pliego de denuncia lo escribió la secretaria de su oficina; que ella le había escrito la información a la secretaria y que ésta l[o] pasó al pliego de denuncia, ell[a] lo cotejó y era igual a la información que ella personalmente había escrito; que lo que ella redactó y la secretaria de su oficina pasó a máquina fue igual a que lo que le llevó al Juez. En ese momento se confrontó a la testigo con el hecho de que en el pliego de denuncia, ella no aludía a dos besos y admitió que era correcto. Contestó que no se le olvidó incluir el otro, pero que lo suprimió: que también lo suprimió en la declaración jurada que nrestód — l que solamente fueron dos besos, ..., que si la menor dijo al Tribunal que habían sido tres besos, no sería correcto; qué ésta le dijo a ella que solamente fueron dos besos; que si dijo que fueron tres besos tenía que estar equivocada. (Véase E.N.E. pág 20) (Enfasis nuestro.)
Se confrontó a la testigo con el pliego de denuncia que ella había presentado. Se aludió a que el pliego decía “luego me dijo, te puedo dar un beso en la boca, yo le dije que no”. Se le preguntó que quién le proveyó esa información. Contestó que la menor. Esta fue confrontada con el testimonio de J.N.C., que había negado que ella brindara dicha información. La agente contestó que esa información fue la que le dio la menor durante la entrevista. Que si la menor había dicho en sala que esa información ella no se la suministró, estaría incorrecta.
*679 (Véase E.N.E. págs. 20-21).
Se siguió confrontando a la testigo con el pliego de denuncia que ella presentó y en el cual se decía la frase “me dijo que bonita me veía”. La respuesta sobre lo anterior de la agente fue que eso fue un error. Se le preguntó de quién fue el error e indicó que fue de la secretaria y de ella. Admitió, además, que el error fue de ella primero, y que la secretaria lo que hizo fue pasar lo que ella redactó. Sin embargo, se confrontó a la testigo, con el hecho de que anteriormente en su testimonio había dicho que ella cotejó el pliego de denuncia y que era igual a lo que le había entregado a la secretaria. (Véase E.N.E. pág. 20). Ante ese hecho, admitió que el error del pliego había sido entonces de ella. Que cuando fue ante el Juez cometió el mismo error. Que no le aclaró al Juez que esa frase, “me dijo que bonita me veía”, a ella no se lo habían dicho. Que hubo error en el pliego tanto por ella, como por la secretaria, como lo hubo, también, en el día en que se sometió la denuncia. (Véase E.N.E. pág. 21). (Enfasis nuestro.)
Se le preguntó a la testigo si cuando ella fue a la oficina del apelante a investigar, si cotejó la “esquina” que se alude en la denuncia. Contestó que se interesó en saberlo. Sin embargo, indicó que no chequeó la “esquina”. Indicó que lo que ella le dijo a la fiscal fue que cuando la menor salió del pasillo y que alegadamente le habían dado el beso, ella vino al “counter” y cogió la cita. Que eso se lo dijo la menor a ella. Se confrontó a la testigo con el testimonio de la menor, quien declaró que cuando el apelante la llamó, ella ya tenía la cita en la mano y que después fue que la llamaron. Indicó que si la menor declaró eso, tenía que estar equivocada, pues lo que le dijo a ella fue precisamente lo contrario, que la cita se la dieron luego de que el apelante la llamara. Reconoció la testigo que le declaró a la fiscal que J.N.C. le dijo que se [zjafó de la mano, fue al “counted’ y le dieron la cita. Sin embargo, se confrontó con el hecho de que en sala la menor había declarado otra cosa, a lo que la testigo se reafirmó en que lo que ella decía, fue lo que J.N.C. le dijo cuando la entrevistó. (Véase E.N.E. pág. 21).
En el tumo de redirecto, a preguntas de la fiscal contestó que ella no verificó nada dentro de la oficina del apelante. Admite que el apelante puso a su disposición un empleado de la oficina para que le enseñara toda la oficina. Que ella no quería que fuera un empleado, sino que fuera el propio apelante que se la mostrara.
Concluida la pmeba de El Pueblo, el apelante presentó como pmeba documental un calendario que acreditaba exactamente la fecha del martes 27 de junio de 2000 y las fotografías que presentaban la puerta sobre la cual los testigos habían declarado. (Véase E.N.E. pág. 23).
Con esta pmeba, el tribunal encontró culpable al apelante y le sentenció a una pena de multa de $400.00.
En su recurso, el apelante plantea, específicamente los siguientes errores:

“(1) Cometió error de derecho, el Honorable Tribunal de Primera Instancia; Sub-Sección de Distrito, al declarar al aquí apelante, culpable del delito de agresión agravada en modalidad menos grave, no empece a que en el pliego de denuncia, la realidad era, que el cargo que se imputaba era uno de agresión simple; por lo que al emitir el fallo y la sentencia, quebrantó el Art. II, Secs. 7 y 11 de la Constitución de Puerto Rico, y las Enmiendas V, VI, XIV de la Constitución de los Estados Unidos de Norte América; así como lo resuelto en Pueblo v. Flores Betancourt, 124 DPR 867, 883 (1989); Cole v. Arkansas, 333 US 196, 201-202 (1947) y su progenie.

(2) Cometió error de derecho, el Honorable Tribunal de Primera Instancia, Sub-Sección de Distrito, al apreciar la evidencia presentada en el caso de autos, y declarar culpable al apelante, pues dicha evidencia no sostenía la culpabilidad del denunciado más allá de duda razonable como lo requiere el Art. II, Sec. 11 de la Constitución de Puerto Rico. ”

*680 Los examinamos en conjunto. Así lo hicieron ambas partes.
II
Para que la conducta de un ciudadano pueda ser penalizada, la misma no sólo tiene que estar tipificada como delito, sino que tiene que haberse realizado con intención o negligencia criminal. El Artículo 14 del Código Penal formula este corolario como el principio de legalidad, nullum crimen sine culpa. Se trata del requisito de que nadie sea responsabilizado penalmente por una acción u omisión que la ley no tipifique como delito.
El criterio de capacidad mental o culpabilidad, aquí esbozado, presupone imputabilidad; entiéndase la capacidad de la persona de actuar según determinado estado mental subjetivo, o sea de actuar culpablemente. Este primer párrafo del artículo recoge la norma de derecho angloamericano que requiere la concurrencia entre el actus reus y la mens rea en los delitos de responsabilidad penal subjetiva. 
El segundo párrafo indica la forma en que puede manifestarse la intención o negligencia de una persona al actuar. Establece cuatro criterios: (1) circunstancias relacionadas con el delito, (2) capacidad mental o imputabilidad del acusado, (3) sus manifestaciones, y (4) conducta. El elemento mental constituye una cuestión de hecho a ser evaluado por el juzgador de los hechos a base de las circunstancias relacionadas con el delito y la conducta del imputado. Véase Pueblo v. Ortiz Rodríguez, 100 D.P.R. 972, 979 (1972); Pueblo v. Torres Nieves, 105 D.P.R. 340, 346 (1976); Pueblo v. Palou, 80 D.P.R. 364 (1958); Pueblo v. Rodríguez Rivera, 84 D.P.R. 299 (1961); Pueblo v. Torres Pérez, 81 D.P.R. 680, 682 (1960); Pueblo v. Soriano Rodríguez, 92 D.P.R. 46 (1965); Pueblo v. Torres Nieves, 105 D.P.R. 340 (1976); Pueblo v. Bonilla Ortiz, 123 D.P.R. 434 (1989); Pueblo v. Narváez, 122 D.P.R. 80, 90 (1988); Pueblo v. Flores Betancourt, 124 D.P.R. 867 (1989).
El Artículo 15 del Código Penal dispone las modalidades de la intención que trata el Artículo 14, supra. Bajo el inciso (a) se describe que el acto u omisión en que el resultado delictivo ha sido previsto y querido por la persona como la consecuencia de su conducta; lo que equivale a una intención específica de llevar a cabo el delito. El acápite (b) del artículo, entonces, define lo que se denomina como intención general. Significa que el resultado delictivo, aunque no fue querido, fue previsto o pudo serlo como consecuencia natural o probable de la acción u omisión realizada.
El concepto de intención general ha sido discutido por el Tribunal Supremo de Puerto Rico en el caso de Pueblo v. Robles González, 132 D.P.R. 554-561 (1993). El mismo fue explicado siguiendo la doctrina desarrollada en el derecho angloamericano, de donde tiene su origen, y en particular del principio versari in re illicita, que establece que toda persona es responsable de las consecuencias naturales y probables de sus actos. Bajo este concepto, la persona se responsabiliza penalmente por el resultado de su conducta si es que la misma está tipificada como delito, aunque no haya querido el resultado, siempre que el mismo haya sido o pudiera ser previsto por una persona prudente y razonable.
El concepto de intención general del artículo no requiere prueba específica respecto a la intención, como en los casos de intención específica, sino que el comportamiento sea tal que demuestre una intención general de cometer el acto tipificado como delito. Tal intención general se determinará de las circunstancias generales que rodean la conducta. El criterio determinante será si el resultado delictivo fue una consecuencia natural o probable de los actos del acusado. Véase Pueblo v. Robles González, supra; Pueblo v. Lucret Quiñones, 111 D.P.R. 716, 740(1981).
Atendido el concepto intencional, examinemos el delito de agresión agravada imputado al apelante.
III
El Código Penal, en su Artículo 94, sanciona como agresión el empleo de fuerza o violencia contra una *681 persona para causarle daño. Véase Pueblo v; Bonilla Ortiz, supra. El bien jurídico protegido en este articulado es la integridad corporal de toda persona. Sus elementos son: (i) el empleo de fuerza o violencia; (ii) contra una persona; (iii) que ello se haga para causarle daño. Véase Pueblo v. Bonilla Ortiz, supra; González v. The Commonwealth Ins. Co., 140 D.P.R. 673 (1996); Pueblo v. Soto González, 149 D.P.R._, (1999), 99 J.T.S. 117, Sentencia del Tribunal Supremo de Puerto Rico. Del uso de la preposición “para”, se infiere que el tipo requiere la intención de causarle daño. Asimismo, es necesario que se establezca una relación causal entre el empleo de fuerza o violencia y el daño que se le cause a la persona. 
El Código Penal no define los conceptos fuerza o violencia. El término fuerza se ha definido como “aquella causa capaz de modificar el estado de reposo o de movimiento de un cuerpo o de deformarlo”. Violencia se define como la “cualidad de violento”. Lo violento es aquéllo que obra con ímpetu y fuerza. Véase Diccionario de La Real Academia, Vigésima Segunda Edición (2001).
Este acto de agresión se considerará agravado (menos grave), entre otros, “cuando se cometiere por un varón adulto en la persona de una mujer o por una persona adulta -sea hombre o mujer- en la persona de un niño menor de dieciséis (16) años.” Pueblo v. Soto González, supra; Pueblo v. Rivera Morales, 133 D.P.R. 444 (1997).
Estas circunstancias aluden todas a una situación en que el agresor aprovecha su ventaja física sobre la víctima. La agresión se considera particularmente reprensible tanto porque hay mayor peligro para la víctima físicamente desventajada porque se trata de situaciones donde existe una conocida propensión al abuso. Véase Pueblo v. Rivera Morales, supra. Por tanto, para que pueda mediar una convicción por este delito, el Ministerio Público está en la obligación de probar más allá de duda razonable, los elementos ya mencionados.
Nuestro más alto foro, en el caso de Pueblo v. Villaveitía, 41 D.P.R. 316 (1930), resolvió que agresión o contacto físico ilegal realizado por un hombre contra la persona de una mujer, sin el consentimiento de ésta, así como tomarse cualquier libertad indecente con ella, equivale al delito de agresión. De igual modo, dicho foro, en Pueblo v. Díaz, 62 D.P.R. 499, 504 (1943), estableció que el daño no tiene que ser corporal, pudiendo constituirlo cualquier contacto ilegal realizado sin el consentimiento de la víctima, que ofenda su pudor, le produzca vergüenza, humillación o angustia mental.
Se entenderá, pues, que de configurarse cada uno de los elementos antes discutidos, y la conducta ha sido una no deseada ni consentida por la víctima, se habrá incurrido en el delito de agresión, según tipificado en nuestro ordenamiento jurídico. Claro está, y de conformidad con la doctrina prevaleciente en nuestra jurisdicción, el Estado debe demostrar mediante evidencia directa o circunstancial, o una combinación de ambas, la culpabilidad del acusado más allá de duda razonable. Las circunstancias susceptibles de ser evaluadas y consideradas en la determinación de la culpabilidad de un acusado son las siguientes: (1) circunstancias prospectivas: esto es, hechos anteriores al crimen y que apuntan hacia su futura comisión como motivo, plan, preparativos, etc.; (2) circunstancias concomitantes: son los hechos simultáneos del crimen que permiten que se lleve a cabo por el acusado. Lo anterior se observa con la presencia del acusado en el lugar del crimen, acceso a la víctima, etc.; y por último, (3) las circunstancias retrospectivas. Aquí están incluidas los hechos posteriores al crimen, que sugieren que el acusado lo cometió, como por ejemplo, la fuga, ocultación de evidencia, etc. Véase Pueblo v. Torres Nieves, 105 D.P.R. 340, 346 (1976).
Así pues, para obtener una válida convicción que supere la presunción de inocencia del acusado, el Ministerio Público está en la obligación de presentar prueba que establezca más allá de duda razonable todos los elementos del delito y su vínculo con el acusado. Véase Pueblo en interés del menor F.S.C., 128 D.P.R. 931 (1991); Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587 (1994); Pueblo v. González Román, 138 D.P.R. 691 (1995); Pueblo v. Collado, 140 D.P.R. 107 (1996); Pueblo v. Calderón Alvarez, 140 D.P.R. 627 (1996); Pueblo v. Rodríguez, 149 D.P.R._(1999), 99 J.T.S. 186; Pueblo v. Rivera Ortiz, 150 D.P.R._(2000), 2000 J. *682 T.S. 52; Pueblo v. Agostini Rodríguez, 151 D.P.R._(2000), 2000 J.T.S. 103; Pueblo v. Irizarry Irizarry, 156 D.P.R._(2002), 2002 J.T.S. 68.
Es decir, tiene que ser prueba que, como mínimo, exponga todos los elementos del delito y sea susceptible de ser creída por una persona prudente. Requiere poder identificar en la pmeba aquellos elementos necesarios en derecho para poder concluir que una persona es culpable de haber cometido el delito. El análisis recae sobre la evidencia que se presenta para asegurar, de cualquier manera que se interprete, la veracidad, y así permitir cualquiera de los posibles veredictos provistos por las Reglas de Procedimiento Criminal. 
Cuando existen conflictos de pmeba, corresponde precisamente al juzgador de los hechos dirimirlos, particularmente cuando están en cuestión elementos altamente subjetivos. Flores v. Domínguez, 146 D.P.R. 45 (1998). Por otro lado, es al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables. 
La credibilidad consiste én una asignación valorativa de certeza o probabilidad sobre una versión de los hechos o acometimientos incidentales al caso. El jurado o el juzgador de los hechos está llamado a hacer este ejercicio valorativo sobre la totalidad de la prueba y sólo requiere valerse del sentido común, la lógica y la experiencia para deducir cuál de las versiones prevalecerá. No puede perderse de vista que al evaluar la totalidad de las circunstancias, los tribunales deben tener presente que es obligación y responsabilidad del Ministerio Público demostrar la culpabilidad del acusado más allá de toda duda razonable. Es imperante que en caso de duda, prevalezca la presunción de inocencia y por lo tanto la absolución de la persona.
V
Hemos leído en varias ocasiones la Exposición Narrativa de la Pmeba aceptada como correcta por las partes en este caso. La hemos expuesto casi íntegramente en esta sentencia. El detenido, pormenorizado y desapasionado análisis que hemos hecho de la misma, a la luz del estado de derecho vigente, produce en nuestro ánimo insatisfacción con el dictamen emitido. La duda que produce en nuestro ánimo este caso surge por la falta de pmeba en apoyo de lo imputado. Concurrimos con el Procurador General en su señalamiento de que “[cjiertamente, los actos específicos alegados en la denuncia en cuanto a que el acusado se acercó a la niña para darle un beso y ésta viró su cara y se lo dio cerca de la boca en contra de su voluntad, no fueron probados”. (Escrito del Procurador a la página 19, énfasis nuestro.) El Procurador General sostiene que la pmeba demostró que el apelante la besó en la mejilla sin su consentimiento en el pasillo del consultorio. Que esto fue una “variación inmaterial que no afectó los derechos del acusado”. (Escrito del Procurador, a la página 19) Diferimos. La pmeba que desfiló en este caso no sólo es incompatible con los hechos imputados, sino que los testigos -incluyendo la policía-, admiten que han “variado” los hechos por decir lo menos.
Es correcta la exposición que hace el Procurador General de la facultad que tiene el Tribunal Examinador de Médicos para suspender, cancelar o aún revocar la licencia de todo médico que en su práctica incurra en conducta no profesional. Probablemente, lo más “saludable” para éste y otros facultativos sea abstenerse de todo tipo de contacto del cual pueda haber la más leve inferencia de hostigamiento o contacto ofensivo.
Sin embargo, nuestra función no es, en este momento, evaluar la conducta ética de este médico, que acostumbra besar “en el cachete” a todas sus pacientes.
Nuestra jurisdicción se limita a evaluar la pmeba presentada bajo el crisol constitucional por el cual estamos obligados a resolver. Bajo ese prisma, resolvemos revocar el dictamen apelado. El foro recurrido, de conformidad con lo aquí dispuesto, absolverá al apelante.
Notifíquese.
*683 Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aidalleana Oquendo Graulau Secretaria General
ESCOLIOS 2003 DTA 12
1. El Procurador General presentó su escrito el 8 de octubre de 2002.
2. 33 L.P.R.A. sec. 4032(c)
3. Véase E.N.E. pág3.
4. La Denuncia que se encuentra en la página una (1) de los Autos Originales, reza: ‘‘...se acercó para darme un beso, yo vire la cara y me lo dio cerca de la boca... ”.
5. 33 L.P.R.A. see. 3061
6. Nevares Muñiz, D., Código Penal de Puerto Rico Comentado, págs. 26-28, Instituto para el Desarrollo del Derecho, Inc. Ed. 2001

7. Id.

8. 33 L.P.R.A. see. 3062.
9. 33 L.P.R.A. sec. 4031.
10. Nevares Muñiz, D., Código Penal de Puerto Rico Comentado, supra, pág. 170.
11. 34 L.P.R.A. Ap. II, R. 147.
12. Pueblo v. Chévere Heredia, 139 D.P.R. 1 (1995).